United States District Court
Southern District of Texas

**ENTERED**

January 06, 2017

David J. Bradley, Clerk

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | |
|---|---|
| THOMAS FORD, | § |
| *Plaintiff*, | § |
| v. | §    CIVIL ACTION NO. 4:15-CV-00664 |
| TEXAS DEPARTMENT OF | § |
| CRIMINAL JUSTICE, | § |
| *Defendant*. | § |

## OPINION ON SUMMARY JUDGMENT

Plaintiff Thomas Ford brought this Title VII suit against his employer, the Texas Department of Criminal Justice, to challenge a demotion and other disciplinary actions as discrimination based on race and retaliation for protected activity. Before the Court is defendant TDCJ's for summary judgment (Dkt. 59), fully briefed and orally argued at a hearing on September 12, 2016. The motion will be granted.

## Background[1]

Ford began working for TDCJ as a correctional officer in June 2006. By August 2010, Ford had been promoted to sergeant and was assigned to the Huntsville Unit. On June 1, 2013, Ford was promoted to lieutenant by Senior Warden Pamela Baggett, and assigned to the Holliday Unit.

During the course of the next year, Ford was given three formal reprimands by Warden Baggett for violations of TDCJ policy. The first reprimand was issued January 6, 2014, for unexcused absenteeism, a level 3 offense.[2] Dkt. 59-2, at 43. According to the offense report, Ford reported for duty four hours late on 12/20/13 because he was

---

[1] **The following facts are either undisputed or viewed in the light most favorable to the plaintiff.**

[2] TDCJ follows a progressive disciplinary scheme referred to as "PD 22" and described in the General Rules of Conduct and Disciplinary Guidelines for Employees. Employee conduct rules are categorized by levels, with Level 1 as most serious and Level 4 as least serious. Dkt. 59 at 2 n.8.

refereeing a game. Ford signed the offense report below his handwritten admission: "This was my fault. I failed to notify the Captain about my game to get approval." Dkt. 59-2, at 48. Ford was placed on four months disciplinary probation, ending 5/5/14. *Id.* at 43.

The second discipline was issued March 18, 2014 for allowing a subordinate to conduct the unit formal count, a violation of policy and Level 2 offense. Dkt. 59-2, at 30. Again, Ford signed the offense report, stating that "I did allow Sgt. Ridenbaugh to conduct the unit count." *Id.* at 37. Ford was suspended without pay for four days, and placed on disciplinary probation for 10 additional months, ending 3/5/15.

The third discipline was issued on April 17, 2014 for failure to follow proper reporting procedures for an inmate-on-inmate assault that resulted in serious injury, a violation of policy and Level 2 offense. Dkt. 59-2, at 3. Ford signed the report, acknowledging that he had asked another officer to send the EAC report for him, and attempting to justify his actions. Warden Baggett signed the reprimand form recommending Ford's dismissal, based on TDCJ's progressive disciplinary policy for three violations within a two-year period. Dkt. 59, at 23.

Ford challenged this decision, requesting mediation through TDCJ Region I Director Richard Alford. As a result of the mediation, Ford was permitted to return to work on May 13, 2014 under the following conditions: he would be transferred to the Wynne Unit, demoted to Correctional Officer V, placed on 6 months' probation, and given counseling on TDCJ policies and procedures. Dkt. 59 at 8. Ford remains employed in that position.

On November 19, 2014, Ford filed this lawsuit against TDCJ, claiming that the disciplinary actions resulting in his demotion were the product of race and sex discrimination by Warden Baggett. He further claims that he has been subjected to unlawful retaliation at the Wynne Unit after the filing of his suit. Specifically, he points to three "bogus" disciplinary incidents beginning in September 2015. In the first, Ford was required to provide a doctor's note in order to return to work after being off several days; Ford complained that his absences had been approved, and so a doctor's note should not have been required. The other two incidents occurred in 2016, when Ford was written up for leaving his duty station without approval and refusing a direct order to conduct a recount. Neither disciplinary action was pursued after Ford protested. Dkt.66, at 24-25.

## Standard of Review

Summary judgment is appropriate if no genuine issues of material fact exist, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The party moving for summary judgment has the initial burden to prove there are no genuine issues of material fact for trial. *Provident Life & Accident Ins. Co. v. Goel*, 274 F.3d 984, 991 (5th Cir. 2001). Dispute about a material fact is genuine if the evidence could lead a reasonable jury to find for the nonmoving party. *In re Segestrom*, 247 F.3d 218, 223 (5th Cir. 2001). "An issue is material if its resolution could affect the outcome of the action." *Terrebonne Parish Sch. Bd. v. Columbia Gulf Transmission Co.*, 290 F.3d 303, 310 (5th Cir. 2002).

In Title VII discrimination cases, a plaintiff may defeat a summary judgment motion by any admissible evidence from which a fact-finder might reasonably infer

discriminatory intent behind the employer's action. *Conlay v. Baylor College of Medicine,* 688 F.Supp.2d 586, 593 (S.D. Tex. 2010). The Supreme Court in *McDonnell Douglas* cautioned against enshrining one fixed set of elements for every Title VII case: "The facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from [the plaintiff] is not necessarily applicable in every respect to differing factual situations." 411 U.S. 792, 802 n.13 (1973). *See also Byrd v. Roadway Express, Inc.,* 687 F.2d 85, 86 (5th Cir. 1982) ("[N]o single formulation of the prima facie evidence test may fairly be expected to capture the many guises in which discrimination may appear. The focus of the inquiry may not be obscured by the blindered recitation of a litany.") (citations omitted). In *Jatoi v. Hurst-Euless-Bedford Hosp. Auth.,* the Fifth Circuit explained the court's task:

> If a plaintiff cannot establish some or all of the *McDonnell Douglas* steps, the district court must examine all the evidence that has been adduced for other indicia of racial discrimination . . . and determine whether it is more likely than not that the employer's actions were based on illegal discriminatory criteria.

807 F.2d 1214, 1219 (5th Cir. 1987).

To establish a claim of unlawful retaliation under Title VII, the plaintiff must prove (1) protected activity, (2) adverse action by the employer, and (3) causal connection between the two. 42 U.S.C. § 2000e-3(a); *Pierce v. Texas Dept. of Criminal Justice,* 37 F.3d 1146, 1151 (5th Cir. 1994). The Supreme Court has held that the employer's actions must be "materially" adverse, which in this context means "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of

discrimination." *Burlington Northern and Santa Fe Ry. Co. v. White,* 548 U.S. 53, 56 (2006).

**Analysis**

**A. Discrimination**

Plaintiff asserts that he was the victim of a racially discriminatory scheme by Warden Pamela Baggett and her chain of command to terminate African American employees by "manufacturing a rapid series of disciplinary actions based upon false or contrived allegations of policy violations." Dkt. 66, at 1.  Ford has produced no direct evidence of racial bias by Warden Baggett, such as racial slurs or comments. Instead, Ford relies on indirect modes of proof routinely found in Title VII cases --- dissimilar treatment of similarly situated employees, statistics, and pretext. Each category will be addressed in turn.

***Dissimilar treatment.*** Preferential treatment of similarly situated employees outside the plaintiff's protected class is an accepted type of Title VII proof. *Nieto v. L & H Packing Co.,* 108 F.3d 621, 623 (5th Cir. 1997). This usually requires a showing that "those employees' circumstances, including their misconduct, must have been 'nearly identical.'" *Perez v. Texas Dep't of Crim. Justice,* 395 F.3d 206, 213 (5th Cir. 2004) (quoting *Little v. Republic Ref. Co.,* 924 F.2d 93, 97 (5th Cir. 1991)).   In his deposition, Ford identified four non-Black lieutenants as comparators who were not discharged under similar circumstances. But none of these are proper comparators. Three of them (Ragazinsky, Graham, and Hatthorn) had no prior disciplines during the time they were lieutenants at the Holliday unit. Dkt. 59, at 14. The fourth (Michele Uribe) was similarly

situated to Ford, in that she did have three disciplinary actions within two years. However, she received exactly the same punishment as Ford --- initially recommended for termination, but demoted to correctional officer, placed on probation, and transferred to a different unit following mediation. *Id.* No reasonable inference of discrimination can be drawn from such circumstances.

*Statistics*. After the summary judgment was filed, plaintiff successfully moved to compel discovery of evidence attempting to show the existence of a discriminatory scheme by Warden Baggett to reduce or eliminate the number of African American officers under her command. Dkt. 68.  Ford submitted this evidence in a supplemental filing. Dkt. 73-1.The evidence consists of answers to two interrogatories: the first sought to identify sergeants or lieutenants who had received multiple disciplinary actions within the same month; the second sought a list of all African American officers who resigned, transferred, or were terminated under Warden Baggett. The relevant time period was from January 1, 2013 through March 31, 2016.

Neither discovery response creates a reasonable inference of a discriminatory pattern or practice by Warden Baggett. The first interrogatory answer identifies six individuals who received more than one discipline within a one month period – two Whites and four Blacks (including Ford). The second interrogatory answer lists twelve African American officers, of whom six were transferred (including Ford), four retired, and two resigned. None were terminated, and no evidence was produced to indicate that the retirements or resignations were involuntary. Even if they had been, these unadorned numbers are far too small a sample to draw any meaningful inference of a discriminatory

pattern or practice. *See Adams v. Reed,* 567 F.2d 1283, 1286 (5th Cir. 1978) (numbers "drawn from a pool too small to produce highly valuable evidence" held insufficient for prima facie case of sex discrimination in hiring); *Mems v. City of St. Paul,* 224 F.3d 735, 740-41 (8th Cir. 2000) (sample size of three to seven was too small to be significant in race discrimination case).

*Pretext*. TDCJ's stated reason Ford's demotion was its progressive disciplinary policy authorizing more severe punishment, up to and including termination, for three disciplinary violations within a two year period. Dkt. 69, at 2. Ford does not question the existence of the policy, but does cite mitigating circumstances which he contends should have caused management not to punish any of the three infractions. For example, regarding the first discipline for unexcused absence, Ford admits that he reported to work four hours late, but now claims that he received permission in a phone call with Capt. Ragazinsky 15 minutes before the shift began. Dkt.66-1, at 5. This directly contradicts Ford's written admission the day after the offense: "This was my fault. I failed to notify the Captain about my game to get approval." Dkt. 59-2, at 48.

Similarly, regarding the second discipline, Ford admits allowing a sergeant to conduct the unit formal count, which TDCJ considered a violation of policy. Dkt. 66-7. Ford contends that the written policy allowed sergeants to "assist" the lieutenant or captain with the count, and presented evidence that this was a common practice. Dkt. 66-1, at 7; Dkt. 66-2, at 3. In this case, however, it appears that the sergeant did more than merely "assist"; he conducted the count himself from start to finish. Dkt. 59-2, at 37. It is certainly within management prerogative to interpret and apply its own policies. Ford also

argues that during the disciplinary Warden Baggett told him that the real reason he was being disciplined was "because she was tired of receiving complaints against me from my staff for sexual harassment, racism, favoritism, and discrimination." Dkt. 66-1, at 7.[3] Even if one accepts this as some evidence of "pretext" on Warden Baggett's part, it is not a pretext for *racial* bias, and so does nothing to advance Ford's discrimination claim.

As for the third discipline, Ford again concedes the underlying factual basis of the charge --- an inmate assault resulting in serious injury occurred near the end of his shift, and Ford neither initiated an Offender Protection Investigation (OPI) nor reported the injury to the Emergency Action Center. Dkt.66, at 16.  Ford argues that he had begun the EAC report, but because he did not have full medical information from the nurse when his shift ended he asked the relieving lieutenant to finish it for him. Dkt. 66-1, at 8.  At best, this is an argument for mitigation, rather than pretext. Ford's contention is that under all the circumstances discipline was unfair, not that it was racially discriminatory. But employment discrimination laws are "not intended to be a vehicle for judicial second guessing of business decisions, nor . . . to transform the courts into personnel managers." *EEOC v. Louisiana Office of Community Servs.,* 47 F.3d 1438, 1448 (5th Cir. 1995), quoting *Bienkowski v. American Airlines, Inc.,* 851 F.2d 1503, 1507-08 (5th Cir. 1988).

For these reasons, there is no basis for a reasonable fact-finder to infer that the stated reasons for TDCJ's actions were mere pretexts for racial discrimination.

---

[3] Both sides devote much attention to earlier charges of sexual harassment against Ford by several female officers, which were investigated but resulted in no formal discipline for Ford.  In the Court's view, these charges are irrelevant, because they have nothing to do with race and were not the stated reason for any of the actions taken against Ford by TDCJ.

*Other evidence*. Ford presents statements from co-workers alleging that they were victims of, or witnesses to, other incidents of race discrimination at TDCJ. The Court has considered this evidence carefully, and concludes that it is too remote and insubstantial to warrant any inference that either Ford's demotion or the disciplinary events leading to it were the product of race discrimination.

## B.   Retaliation

Ford's concedes that he did not engage in Title VII protected activity prior to the demotion and transfer to the Wynne Unit. Dkt. 66, at 23. He did subsequently engage in protected activity by filing an EEOC charge on August 14, 2014, and this lawsuit on November 19, 2014. Dkt. 69-3; Dkt. 1, at 1.  The alleged retaliation took the form of three incidents occurring more than a year after the EEOC charge, none of which resulted in formal disciplinary action or letters of instruction to Ford. Dkt. 66, at 23-25.

The first took place in September 2015, when Ford was off for several days and was told by his supervisors that a doctor's note would be required in order to return to work. Dkt. 66-1, at 10. Ford contended that a doctor's note was unnecessary because his leave had been approved, but his protest was unsuccessful. It is not clear from the record whether Ford lost any pay as a result of this incident. Assuming he did, there is no basis in the record to infer any causal connection between Ford's protected activity and this incident. The temporal gap alone is simply too wide to support such an inference.[4]  *See*

---

[4] Ford points out that the Wynne Unit chain of command were notified of Ford's protected activity by a July 2015 email from Larry Jones. Dkt. 66, at 23. But nothing in the record suggests that this was the first time those TDCJ officials had learned about Ford's 2014 EEOC charge and lawsuit.

*Strong v. University Health Care System, L.L.C.*, 482 F.3d 802, 808 (5th Cir. 2007); *Shirley v. Chrysler First, Inc.*, 970 F.2d 39, 44 (5th Cir. 1992).

The remaining two incidents occurred in 2016, so they are even more remote in time from the protected activity. Like the first incident, nothing in the record suggests any causal link between these incidents and the filing of this lawsuit. Moreover, neither of the 2016 incidents resulted in any discipline for Ford, nor did they result in loss of pay or change of status or demeaning job duties. *Cf. Marroquin v. City of Pasadena,* 524 F.Supp.2d 857, 864-65 (S. D. Tex. 2007). As a result, the Court concludes that neither of these incidents are serious enough to dissuade a reasonable employee from making or supporting a charge of discrimination. Therefore, regarding these two incidents, Ford has also failed to demonstrate a genuine issue of material fact on the second element of his retaliation claim --- that he has suffered a materially adverse action under the *Burlington Northern* standard. 548 U.S. at 57.

## Conclusion

Ford has not presented sufficient evidence to avoid summary judgment on both his Title VII discrimination and retaliation claims. The Texas Department of Criminal Justice's motion for summary judgment (Dkt. 59) is granted.

Signed at Houston, Texas on January 5, 2017.

Stephen Wm Smith
United States Magistrate Judge